Per Curiam.

The relator, the Columbus Bar Association, filed a Complaint against the respondent, Carlton S. Dargusch, Sr., containing 14 specifications of misconduct alleged to have been in violation of Canons 6,11, 22, 29, 32 and 38 of the Canons of Professional Ethics. Except for specifications 1, 6 and 10, which will be discussed below, the Board of Commissioners on Grievances and Discipline found that the charges were not sustained by the evidence and recommended that the respondent be publicly reprimanded.
On September 29, 1964, this court issued an order to show cause why the findings of fact by the board of commissioners should not be adopted and, if they or any part of them were adopted, what disciplinary action should be taken. On November 5, 1964, the court heard arguments on behalf of the relator and the respondent.
The basic question raised in this proceeding is whether the respondent acted unprofessionally, while serving as trustee of three living trusts, by representing conflicting interests without a full disclosure of the same to the beneficiaries of the trust. The standards which a lawyer who may represent conflicting interests must observe are found in Canons 6,11 and 38, which provide in pertinent parts:
Canon 6. “It is unprofessional to represent conflicting interests, except by express consent of all concerned given after *96 a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.”
Canon 11. “Money * * * or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances * * * be used by him.”
Canon 38. “A lawyer should accept no compensation, commissions, rebates or other advantages from others without the knowledge and consent of his client after full disclosure.”
The evidence shows that, in 1927, John S. Jones, of Gran-ville, Ohio, died owning approximately 90 per cent of the stock of the Sunday Creek Coal Company (hereinafter called Sunday Creek), the stock of the Granville Inn and Golf Course, Inc. (hereinafter called Inn), as well as a 600-acre farm. In his will, he placed the foregoing property in a testamentary trust for his three daughters. In 1942, the testamentary trust terminated, and thereupon the three beneficiaries each established a living trust with Chester C. Cook, then chairman of the board of Sunday Creek and its vice-chairman and treasurer, as trustee for each trust.
Respondent’s connection with Sunday Creek dates from 1938, when he became general counsel and director of the company, until October 1959, when he resigned from his positions with the company and the three trusts were revoked. In 1940, he became vice-president. In September 1951, following the death of Cook, respondent became trustee of each of the three living trusts and also became chairman of the board of Sunday Creek. At that time, while carrying on an extensive and lucrative law practice, he took over control of the company and voted the stock belonging to the beneficiaries of each of the three trusts.
Respondent, individually and through his law firm, served as general counsel for Sunday Creek from 1938 to 1959 at an annual retainer of $10,000. In 1954, a retainer contract covering legal services through December 31,1958, was executed. A new retainer contract for legal services from April 1, 1957, to December 31, 1963, was executed in 1957, In March 1957, re *97 spondent’s annual salary as chairman of the board of directors was increased from $5,000 to $7,500. Under the trust instruments, respondent was entitled to receive after September 1951 trustee fees equal to 7% per cent of the gross annual income of the trusts.
As a result of various controversies that had arisen respecting transactions, occurring through the years, between the respondent on one hand and Sunday Creek, the Inn and the trust beneficiaries on the other hand, a written compromise was entered into among them in September 1960. Under the agreement, in addition to mutual releases, respondent paid $17,000 to Sunday Creek and sold and delivered to Sunday Creek and to the Inn all the stock of such corporations standing in his name or the name of his son, and the two policies of life insurance held by the pension trust of Sunday Creek on the life of respondent were assigned and delivered to him.
With respect to specification 1, the evidence shows that from time to time between 1951 and 1959 respondent caused Sunday Creek to pay his club dues and bills at the Columbus Country Club and the Columbus Club in the amount of $5,762. Sunday Creek also paid $4,292 for respondent’s travel and entertainment and paid $2,634 for liquor bills incurred by respondent. Sunday Creek advanced to the respondent $1,000 from petty cash. He obtained from the Columbus Club during the years 1955 through 1959 cash advances in the amount of $2,570, which advances were paid by Sunday Creek. Substantially all these payments were for bills and expenses personal in nature and were not related to the business of Sunday Creek. There is no evidence that such sums paid to and on behalf of respondent were charged on the accounts of Sunday Creek as “salary” or “compensation” for the respondent. The corporate minutes of Sunday Creek failed to reveal any authorization for any of the payments, and at least Mrs. Sexton, a beneficiary of one of the trusts, was not informed of such payments. The respondent himself failed to recall any notification to any of the beneficiaries of any of these payments on his behalf.
Eelative to specification 6, the record shows that, in July 1958, the respondent, while serving as chairman of the board *98 of Sunday Creek, trustee for each of the three trusts and attorney for Sunday Creek, arranged for a loan of $70,000 to Sunday Creek from the Lomas Trust. Respondent testified that, in order to secure the loan, it was necessary for Sunday Creek to pay the Lomas Trust a finders fee of $2,500. The law firm of which respondent was a senior partner received from the trust a $900 fee for legal work arising from such transaction. Appraisals were secured, and the collateral put up was ample security. No question of prudence is urged or default claimed. Mrs. Sexton, the beneficiary of one of the trusts, had no knowledge of this transaction. In a situation such as this, it is acknowledged that generally the borrower is the one who pays for legal services instead of the lender. At this time, respondent as general counsel for Sunday Creek was receiving an annual retainer of $10,000, under a contract with Sunday Creek executed in April 1957 to end in 1963, to handle the legal affairs of the corporation. Under the circumstances, it reasonably may be inferred that respondent, as trustee, paid a portion of the “finders fee” to himself.
Regarding specification 10, the evidence shows that, in March 1957, at the annual shareholders meeting of Sunday Creek, at which respondent presided as chairman, a resolution was adopted which provided in pertinent part that “in the event of * * * the decease of any other present or future officer or employee who has been in the service of the company for a minimum period of twenty years (including military leave) the salary of such deceased officer or employee shall be continued by the payment of such salary to the widow or heirs for a period of twenty-four months following such decease.” The respondent, as trustee, voted the stock in his control in favor of such resolution. Any payment made under the resolution to the respondent’s heirs or widow would have been a detriment to Sunday Creek, a detriment to the beneficiaries of the three trusts and, of course, a benefit to his heirs or widow. This action was not taken by the respondent with the express consent of the beneficiaries after a full disclosure of the facts. In fact, Mrs. Sexton, one of the beneficiaries, testified that “General Dargusch did not discuss the administrative policy of Sunday Creek with me in any *99 detail at any time. There was no reason why he should. He was a trustee. He was the Chairman of the Board, and he simply did not do it.”
Our careful review of the more than 600 pages of testimony and the approximately 100 exhibits in this proceeding has not been summarized in great detail. However, we believe that the foregoing digest adequately reviews the evidence particularly as it relates to specifications 1, 6 and 10. Since the conduct of respondent as charged and proved in these specifications is contrary to the professional standards quoted above and thus warrants disciplinary action, we find it unnecessary to expound on any doubts which we may entertain respecting other conduct of the respondent affecting his responsibility to the trusts with which he was charged.
A public reprimand as recommended by the board of commissioners is not commensurate with the gravity of the respondent’s violations of the Canons of Professional Ethics. On many occasions, this court has imposed disbarment or suspension for an indefinite period on wayward lawyers for conduct no more reprehensible than that of this respondent. For example, see the following recent cases: Cleveland Bar Assn. v. Bilinski (1964), 177 Ohio St., 43; Cleveland Bar Assn. v. Siegel (1964), 176 Ohio St., 277; Mahoning County Bar Assn. v. Ruffalo (1964), 176 Ohio St., 263; Dayton Bar Assn. v. Prear (1964), 175 Ohio St., 543; Columbus Bar Assn. v. Potts (1963), 175 Ohio St., 101; Columbus Bar Assn. v. Fodor (1963), 175 Ohio St., 21; Columbus Bar Assn. v. Agee (1964), 175 Ohio St., 443; Columbus Bar Assn. v. Jurus (1964), 175 Ohio St., 449; Columbus Bar Assn. v. Margulis (1963), 174 Ohio St., 263; Cincinnati Bar Assn. v. Smith (1963), 174 Ohio St., 452.
The court recognizes the seriousness of depriving one of the privilege of practicing law, particularly for a lawyer who has engaged in the practice since 1925 and who holds and has held many important offices. Although the court does not consider action interfering with such a privilege lightly, it is obligated to apply the standards of professional and ethical conduct uniformly, without regard to length of practice or to the positions a respondent may hold in his community. Under the circumstances of this case, the court is unanimously of the opinion *100 that the minimum discipline should be suspension for an inJ definite period from the practice of law, and such discipline is, hereby, imposed.

Judgment accordingly.

Taft, C. J., Zimmerman, Matthias, O’Neill, Griffith, Herbert and Gibson, JJ., concur.